Filed 11/19/20  In re Emily G. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re EMILY G. et. al., Persons Coming Under the Juvenile Court Law. | B302633 (Los Angeles County Super. Ct. No. 19CCJP06022) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VANESSA G. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed in part; reversed in part and remanded with directions; dismissed in part.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant Vanessa G.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Fernando G.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Vanessa G. (Mother) and Fernando G. (Father) appeal from the juvenile court's jurisdiction findings and disposition orders declaring 17-year-old Emily G., 11-year-old Isabelle G., and six-year-old Nora G. dependents of the juvenile court under Welfare and Institutions Code[1] section 300, subdivisions (b)(1), (d), and (j). The court sustained the allegations Father sexually abused his then-14-year-old stepdaughter Emily, and Mother failed to protect the children from her single incident of domestic violence against Father. With respect to Father's and Mother's appeals as to Isabella and Nora, we affirm the jurisdiction findings as to Father's sexual abuse under section 300, subdivisions (d) and (j), but we reverse the jurisdiction findings under subdivision (b)(1) as to Father's sexual abuse and Mother's domestic violence. Because we reverse a portion of the jurisdiction findings on which the disposition orders were based, we remand for the juvenile court to conduct a new disposition hearing to determine whether Mother should participate in sexual abuse awareness and

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

2

domestic violence counseling.  We dismiss Mother's appeal as to Emily as moot because the juvenile court terminated jurisdiction after Emily turned 18 years old.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Referral and Investigation*

On September 5, 2019 the Los Angeles County Department of Children and Family Services (Department) received a referral alleging Father had sexually molested Emily three years earlier. Emily told the investigating social worker she had been attending individual therapy for three years for school-related stress and depression, but she did not disclose the sexual abuse until recently.  The three sexual abuse incidents occurred the summer after she completed ninth grade.  Father inappropriately touched Emily's breasts under her clothing, rubbed her inner thighs, and kissed her on the lips in a sexual manner on separate occasions. Emily said, "I didn't say or do anything.  I was shocked.  I felt bad.  I didn't tell anyone because I didn't want to tell on my dad." Emily denied she was lying, stating, "Everything I told you is the truth.  It really happened.  I wish it didn't happen.  I have nightmares that he will do it again to me.  I also have nightmares that he will do something to my sisters."  The social worker observed Emily was visibly nervous, anxious, and upset with tears running down her face while she spoke about the sexual abuse.

Emily reported that the prior weekend she had spent time with her maternal grandmother Martha G., who disclosed she had been sexually abused as a child.  Emily believed Mother also had been sexually abused, but Emily did not remember the

3

details. Emily did not observe any domestic violence between Mother and Father. However, Emily was happy Mother planned to end her relationship with Father because Emily felt stressed by their arguments and was afraid of Father due to the prior sexual abuse incidents. Emily stated, "I don't want them back together because of what happened and what he did to me. I feel confused because I know what happened, but I also know it shouldn't have happened. He's supposed to be my dad. I'm scared because I don't know if my mom believes him or me." She did not report the sexual abuse to her family because she "never felt close to my family until recently." Emily was conflicted about whether Father should be punished for the sexual abuse because she considered him her father. She did not have a good relationship with her biological father, Andre A., and her last contact with him was one or two years earlier.

Mother stated she had been in a relationship with Father for approximately 13 years. Mother and Father had been arguing over their finances and issues of infidelity. Mother thought about ending their relationship because of the arguments. Mother reported Emily's therapist, Corina Monster, informed her on September 5 of Emily's disclosure of Father's sexual abuse. Mother was shocked because Emily did not tell her, and Mother never saw Father being inappropriate with any of the children. Mother confronted Father, who denied the allegations. Mother said, "My daughter is my first priority. If she said it happened[,] then I believe it happened." Mother said she would support Emily and ensure Emily knew Mother believed her. Mother reported she too had been sexually abused when she was 12 or 13 years old by her stepfather, who inappropriately kissed her and

4

fondled her breasts.  She also was sexually abused by her maternal step-cousin when she was 15 or 16 years old.

After Mother learned about the sexual abuse, she asked maternal grandmother to pick up the children after school.  Since then, Mother and the children stayed with maternal grandmother in West Covina.  Mother signed a safety plan with the social worker that provided, "Mother agrees to monitor [F]ather's visits and phone calls with Isabelle and Nora.  Mother agrees that there will be no contact between Emily and [Father].  Mother agrees to be protective toward all of the children."

Ms. Monster stated she had been Emily's therapist for approximately a year; however, Emily had been enrolled in therapy for more than two years.  Emily was taking psychotropic medication for her depression and attending therapy twice a week.  Emily told Ms. Monster she believed the medication would help her forget about the sexual abuse.  Ms. Monster reported Emily's sexual abuse allegations to Mother, who was angry, upset, and "shocked" by the allegations.  Mother told Ms. Monster she noticed a change in Emily's behavior approximately three years earlier, when the sexual abuse had occurred.

Maternal grandmother stated she believed Emily was telling the truth about Father's sexual abuse.  She explained, "I believe [Emily].  She's not the type who would lie about something like this.  I don't want anything else to happen to these kids."  She reported Emily had never lied or been manipulative like other children her age.

Father denied he inappropriately touched or kissed Emily.  When asked if Father knew why Emily would report the sexual abuse allegations if they were not true, Father replied, "Maybe because me and their mom have been arguing a lot lately."

According to Father, Emily told him that she thought he and Mother should not be together because of their frequent arguments. Father denied hitting Mother. But he reported that three weeks earlier Mother had punched him in the face with a closed fist when the children were not present. He did not suffer any mark or bruise.

Eleven-year-old Isabelle was in the sixth grade. She was attending therapy for anxiety. Isabelle reported she got along well with her sisters although there was some sibling rivalry. She denied witnessing any domestic violence between Mother or Father. Isabelle also denied anyone had ever inappropriately touched her. If anyone did, she would tell the person to stop and report the incident to Mother. Isabelle stated Mother and Father occasionally argued, but the arguments did not negatively affect her. But maternal grandmother, who was present during the interview at Isabelle's request, later reported Isabelle often complained to her that her parents argued too much.

Six-year-old Nora was in the first grade. Nora reported Father had "smacked her face" and hit her hand with a belt as discipline. She did not have any marks or bruises. Nora reported Mother and Father "argue a lot of times," but they tell her to leave the room when they are arguing. Nora did not observe any domestic violence between Mother and Father. She felt safe at home but feared her parents would end their relationship because of their arguing. Nora wished her parents would stop yelling at her and arguing with each other. She wished "every day is daddy day." She denied anyone had ever inappropriately touched her.

B.    *The Petition and Detention*

On September 17, 2019 the Department filed a petition on behalf of the children alleging Father physically abused Nora by striking her face and striking her hands with a belt; Mother and Father engaged in a violent altercation in which Mother struck Father's face with her fist; and Father sexually abused Emily by fondling her breasts and thighs and kissing her. The petition alleged Father's sexual abuse of Emily endangered Emily and placed her and her siblings Isabelle and Nora at risk of physical harm and sexual abuse.

At the September 18, 2019 detention hearing, the juvenile court detained Isabelle and Nora from Father and released all three children to Mother with family maintenance services. The court ordered Father to have no contact with Emily. The court granted Father monitored visits with Isabelle and Nora for a minimum of six hours per week with a monitor other than Mother.

C.    *The Jurisdiction and Disposition Report*

As of the October 31, 2019 jurisdiction and disposition report, the children remained in Mother's care. Mother and the children were living with the maternal grandfather and planned to stay there until Mother could find another home. Mother had no plans to reconcile with Father, but she was willing to work on coparenting Isabelle and Nora with him. The dependency investigator did not interview Emily, Isabelle, or Nora because the juvenile court prohibited any discussions with the children about the allegations in the petition.

The dependency investigator found insufficient evidence Father physically abused Nora or the other children. As to the

domestic violence allegations, Mother and Father stated they frequently argued after they purchased their house with the paternal grandparents, and they had problems with the paternal grandfather, who lived with them. During one argument in mid-September 2019, Father brought up that Mother had cheated on him early in their relationship. Mother stated, "He recently brought it up and wouldn't let it go. I told him to leave me alone and I punched him on the face." Father reported Mother got upset and punched his cheek during an argument, but "it wasn't that bad, it was more out of frustration." Mother said Father did not hit her back, and it was an isolated incident. According to Father, the incident occurred while the children were at school. Mother admitted the children witnessed some of her arguments with Father, but she added, "[T]hey were mostly at school. If we argue when they were home, Emily would put the kids in the room."

Mother reiterated she "was in complete shock" when Emily's therapist told her Emily had been inappropriately touched by Father on three separate occasions during the summer after ninth grade. She believed Emily and wished Emily had told her sooner. Father denied the abuse and said he had a "great" relationship with Emily. He felt "destroyed" and "couldn't get out of bed" when he heard about Emily's allegations. Father stated, "Honestly, I think it's just the fighting [between Mother and Father]. [Emily] remembers a lot of what that [Mother's former boyfriend] did to her mom, choking and hitting her, that she didn't want it to happen, again."

The investigating detective stated criminal charges would not likely be filed against Father because Emily was not consistent and provided "no details or timeline as to when the

abuse happened." The detective added, "It's more of a 'he said, she said' type of situation and her statements were extremely vague. She . . . said it only happened once and she couldn't describe it. I can't tell you if it happened or not."

The dependency investigator recommended the juvenile court sustain the domestic violence and sexual abuse allegations, explaining, "[T]he children all stated that the parents argue on a regular basis and even though Emily would protect her younger siblings by taking them to their bedroom, the children appear to have been affected by the ongoing arguments as both Emily and Isabelle were enrolled in mental health services. . . . [¶] The parents stated that when the mother punched [Father] in the face, it was an isolated incident. However, in the past the mother had pushed [Emily's] father and the probability of the current domestic violence escalating . . . is high."[2] The dependency investigator stated as to the sexual abuse allegations Mother was protective of Emily, but Father continued to deny he inappropriately touched or kissed Emily.

D.    *The Jurisdiction and Disposition Hearing*
At the November 14, 2019 jurisdiction and disposition hearing, Emily testified Father molested her two times during the summer after ninth grade three years earlier. On one

---

[2]    Emily's father told the dependency investigator that when he decided to leave Mother after a year of marriage, she pushed him into traffic on the street. He did not call the police, but they later divorced. Although Emily's father did not provide a time frame, the incident must have occurred at least 13 years earlier because Mother was with Father for 13 years.

9

occasion, Father touched her inappropriately first in his bedroom, then in her bedroom. On a later occasion he kissed her on the lips while they were in the backyard talking and "hang[ing] out." As Emily described the kissing incident, the judge observed she was emotional and crying. When asked on cross-examination whether she had ever said she was abused three times, Emily responded that Father had touched her "a few times," and then he kissed her on the lips. She added, "So . . . does that count?"

Emily had been in therapy since ninth grade for issues unrelated to Father's abuse. Ms. Monster was her third therapist. When asked why she did not tell her first two therapists of the sexual abuse, Emily answered, "I wasn't ready. I still thought of him as my dad." Emily added she did not feel comfortable disclosing the abuse to the first two therapists, pointing out the first therapist was a man.[3] She finally felt comfortable disclosing the abuse after she thought Mother and Father were going to break up because "[i]f [they] didn't live with him, it would be easier to say something." She admitted Mother and Father had a big argument the weekend before she disclosed the abuse. When Mother said they were going to break up, she "was kind of relieved." But she denied making up the abuse to break up the parents' relationship.

After Emily's testimony and arguments by the attorneys, the juvenile court dismissed the allegations under section 300, subdivision (a)(1), that Father physically abused Nora and that Mother's domestic violence placed the children at risk of serious physical harm. But the court followed the recommendation of the

---

[3] On cross-examination, Emily acknowledged she saw the male therapist before the sexual abuse occurred.

Department and minors' counsel to sustain the sexual abuse allegations under section 300, subdivisions (b)(1), (d), and (j). As to the allegation under section 300, subdivision (j), the court stated, "I understand the other children are [Father's] biological children and may be viewed differently. However, what Emily has described occurred in the home. The behavior is brazen but also done surreptitiously. [¶] And that kind of conduct, that's below the radar but brazen in its attempts to sexually make contact with Emily puts the other two siblings at risk and . . . I think the severity of what's described by Emily is sufficient for this court to find that the siblings would be at risk."

The juvenile court also sustained the allegation under section 300, subdivision (b)(1), that Mother and Father failed to protect the children from a violent altercation in which Mother struck Father. The court stated, "It's not clear that anyone was in the zone of danger. But what [the Department's attorney] described is accurate, which is a building of tension and acrimony between [M]other and [F]ather and that eventually erupted into physical violence. And [it's] unclear just how [far] Father's physical violence has gone, but the evidence seems pretty well in support of a (b)(3) count."

The juvenile court declared the children dependents of the court under section 300, subdivisions (b)(1), (d), and (j). The court placed the children with Mother and removed Isabelle and Nora from Father's physical custody. The court ordered Mother to attend sexual abuse awareness counseling and individual counseling to address case issues including domestic violence. The court also ordered the children to participate in individual counseling to address sex abuse and case issues. The court ordered Father to attend sex abuse counseling for perpetrators

11

and individual counseling to address case issues. The court granted Father monitored visits with Isabelle and Nora for a minimum of six hours per week with the Department having discretion to liberalize visitation.

Mother and Father timely appealed.

## **DISCUSSION**

A. *Governing Law*

"Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re E.E.* (2020) 49 Cal.App.5th 195, 205.) Section 300, subdivision (b)(1), requires the Department to demonstrate three elements by a preponderance of the evidence: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child, (2) causation, and (3) serious physical harm or illness or a substantial risk of such harm or illness. (*E.E.*, at p. 205; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.)

Under Section 300, subdivision (d), a child comes within the juvenile court's jurisdiction if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent . . . or a member of his or her household, or

12

the parent . . . has failed to adequately protect the child from sexual abuse when the parent . . . knew or reasonably should have known that the child was in danger of sexual abuse." (See *In re D.C.* (2015) 243 Cal.App.4th 41, 51.) Under Penal Code section 11165.1, subdivision (b)(4), "sexual assault" includes "[t]he intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification . . . ."

Section 300, "[s]ubdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions." (*In re I.J.* (2013) 56 Cal.4th 766, 774; accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 327-328.) "'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of any of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.'" (*I.J.*, at p. 774; accord, *In re Francisco D.* (2014) 230 Cal.App.4th 73, 81.) "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300." (*I.J.*, at p. 778; accord, *In re S.R.* (2020) 48 Cal.App.5th 204, 207.)

13

"The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165; accord, *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.)

B.    *Standard of Review*

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J., supra*, 56 Cal.4th at p. 773; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633; *In re D.B.* (2018) 26 Cal.App.5th 320, 328 ["We review the entire record to determine whether the trial court's jurisdictional and dispositional findings are supported by substantial evidence."].) "Substantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E., supra*, 49 Cal.App.5th at p. 206; accord, *D.B.*, at pp. 328-329.)

14

C.   *Substantial Evidence Supports the Jurisdiction Finding of Sexual Abuse Under Section 300, Subdivisions (d) and (j), But Not Subdivision (b)(1)*

Mother and Father contend there is insufficient evidence to support the juvenile court's jurisdiction findings under section 300, subdivisions (b)(1), (d), and (j).[4] Substantial evidence supports the juvenile court's jurisdiction findings under section 300, subdivisions (d) and (j), based on Father's sexual abuse of Emily. But we agree substantial evidence does not support the juvenile court's jurisdiction findings of failure to protect under section 300, subdivision (b)(1).

Father argues Emily's statements were inconsistent and lacked a timeline or supporting details. He notes Emily initially disclosed to her therapist that Father molested her on three separate occasions, but she later told the investigating detective the abuse only happened once and she could not describe it. Then at the jurisdiction and disposition hearing, Emily testified Father molested her on two occasions. In addition, Emily testified she did not want to disclose the sexual abuse incidents to her first therapist because he was male, but on cross-examination she acknowledged she saw the male therapist before the alleged

---

[4]   The juvenile court terminated jurisdiction over Emily in March 2020 after she turned 18 years old. Mother's appeal as to Emily is moot because we cannot provide effective relief now that the court has terminated jurisdiction over Emily. (*In re David B.* (2017) 12 Cal.App.5th 633, 652 ["Since David B. cannot be the subject of new dependency proceedings, any ruling we might make could not affect future proceedings involving him."]; *In re N.S.* (2016) 245 Cal.App.4th 53, 61.)

15

sexual abuse occurred.  Father also asserts Emily's allegations that Father kissed her on the lips and touched her breasts mirror the details Mother recounted of her own sexual abuse by her stepfather when Mother was 12 or 13 years old.  Father suggests Emily fabricated the allegations to cause Mother and Father to end their relationship.

Father ignores the juvenile court's finding that Emily's testimony was credible and reliable.  As discussed, we do not reweigh the evidence on appeal, instead determining whether there are sufficient facts to support the court's findings.  (*In re R.T., supra*, 3 Cal.5th at p. 633; *In re I.J., supra*, 56 Cal.4th at p. 773.)  Although there were some inconsistencies in Emily's recounting of the sexual abuse, she repeatedly referred to Father touching her breasts and kissing her in a sexual manner; she provided a time frame (the summer after ninth grade); and she indicated the location of each instance of abuse (Father's bedroom, her bedroom, and the backyard).

As the juvenile court explained, "I know the point of [Father's] contention had been that Emily had manufactured this story simply as a vehicle to stop the fighting at home and that she was seeing this moment as a chance to convince Mother to break from the relationship with her stepfather.  That theory falls.  [¶]  If you look closely [at] what Emily was saying, . . . she doesn't want her stepfather harmed.  She doesn't want him to suffer.  She doesn't see this as a vehicle to have them go separate ways.  What she's described is a secret she kept bottled up in her, and her explanation doesn't fit exactly into a timeline.  But these things often don't.  Recollections become frayed as time goes by, and certain traumatic events may cause certain discrepancies that might cause them to be off by a day or a month.  [¶]  But

16

what she described under oath was compelling, and I had a chance to ask questions of her, as well. And I asked her pointblank: Would you manufacture this? [¶] And she said: No I would not. [¶] Her character has been supported by Mother and maternal grandmother. And, in fact, [Emily's] father offered his thoughts, as well. And putting aside whatever biases he may have, I think the totality of the evidence supports Emily's rendition of facts. [¶] She did indicate why she started therapy. She was forthcoming . . . of the stresses she had there. She became emotional when asked specifically but not in a way that would lead one to believe she's being evasive. [¶] She does speak in a forthright manner about the abuse but does not want to seem to exaggerate or overly dramatize the facts when there would be every opportunity to do so. . . . In fact, it was rather understated, which, I think, furthers the sense that she is . . . a highly credible witness."

Further, Father's abuse of Emily placed Isabella and Nora at risk of sexual abuse. "Cases overwhelmingly hold that sexual abuse of one child may constitute substantial evidence of a risk to another child in the household—even to a sibling of a different sex or age or to a half sibling." (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 968, 970 (*Los Angeles County*); accord, *In re I.J., supra*, 56 Cal.4th at pp. 770, 780 [father's sexual abuse of his daughter provided substantial evidence to support jurisdiction over his three sons]; *In re Ricky T.* (2013) 214 Cal.App.4th 515, 517 [grandfather's sexual abuse of his nine- and 12-year-old stepgranddaughters supported jurisdiction over three-year-old grandson].) Isabelle—who was 11 years old—was at substantial risk of sexual abuse because she was approaching the age when

17

Emily was abused by Father. (*Los Angeles County*, at p. 970 [10-year-old girl at substantial risk of sexual abuse by father where he sexually abused her older half sister beginning when the half sister was seven or eight years old].) Although Nora was only six years old, Father's sexual abuse of her then-14-year-old half sister also placed Nora at risk of serious harm from Father's aberrant sexual behavior.

Mother does not deny Father sexually abused Emily but argues the children were not at substantial risk of harm because Mother was no longer living with Father and did not intend to reconcile with him. Also, she immediately made a safety plan to protect the children and support Emily after Emily disclosed the sexual abuse. But Mother acknowledged she intended to coparent Isabella and Nora with Father, and without juvenile court supervision, Isabelle and Nora were at substantial risk of harm because they would be spending time alone with Father. (See *Los Angeles County, supra*, 215 Cal.App.4th at p. 970 ["Currently, father is not living with mother. This places [the child] at greater risk without juvenile court jurisdiction because, absent juvenile court supervision, [the child] could be spending time alone with father away from mother's home, thereby providing greater opportunity for sexual abuse."].)

However, we agree with Father and Mother there is no evidence to support the jurisdiction finding under section 300, subdivision (b)(1), that they failed to protect the children from Father's sexual abuse. Father's sexual abuse of Emily and the substantial risk of harm to Isabelle and Nora are based on his intentional conduct, not his failure or inability to protect the children. Thus, the jurisdiction finding as to Father under section 300, subdivision (b)(1), lacks evidentiary support.

18

As to Mother, there is no allegation Mother was unable or failed to protect the children from Father's misconduct. Upon learning of Father's sexual abuse, Mother immediately implemented a safety plan by having the maternal grandmother pick up the children from school that day, moving out of the home with the children, preventing Father from having contact with Emily, and monitoring Father's contact with Isabelle and Nora. Under these circumstances, the juvenile court erred in sustaining the allegations that Mother failed to protect the children from Father's sexual abuse.

D.    *The Jurisdiction Finding Based on Domestic Violence Is*
      *Not Supported by Substantial Evidence*

Mother contends the jurisdiction finding based on her domestic violence against Father is not supported by substantial evidence.[5] We agree. "Physical violence between a child's

---

[5]    "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J., supra*, 56 Cal.4th at p. 773; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 896.) An appeal is not justiciable where "no effective relief could be granted . . . , as jurisdiction would be established regardless of the appellate court's conclusions with respect to any such [challenged] jurisdictional grounds." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 329; accord, *In re I.A.*

19

parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [reversing finding children were at substantial risk of physical harm where domestic violence between parents occurred two to seven years before and there was no evidence of continuing violence]; accord, *In re M.W.* (2015) 238 Cal.App.4th 1444, 1453 [single incident of domestic violence seven years before hearing with no evidence of subsequent altercations did not support jurisdiction finding]; cf. *In re T.V.* (2013) 217 Cal.App.4th 126, 135 [sufficient evidence of substantial risk of physical harm to child where parents engaged in multiple instances of domestic violence and violence was likely to continue].) Here, there is no evidence the domestic violence was ongoing, directly harmed the children physically, or placed them at risk of physical harm.

---

(2011) 201 Cal.App.4th 1484, 1490.) Nevertheless, "[c]ourts may exercise their 'discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) "could have other consequences for [the appellant], beyond jurisdiction" [citation].'" (*In re D.P.* (2015) 237 Cal.App.4th 911, 917; accord, *Madison S.*, at p. 329; *In re J.C.* (2014) 233 Cal.App.4th 1, 4.) We exercise our discretion to consider the jurisdiction finding based on domestic violence because Mother challenges the disposition order based on the finding.

The juvenile court rightly was concerned about the escalating verbal arguments that led to Mother punching Father in the face. But according to Mother and Father, this was an isolated incident that occurred at home when the children were at school. Father described the punch as not "that bad," and it did not leave a mark or bruise on Father's face. Emily, Isabelle, and Nora denied observing any domestic violence between Mother and Father. Mother admitted the children witnessed some of her arguments with Father, but most of the arguments occurred when the children were at school, and if the children were home, Emily would take Isabella and Nora to another room. Nora likewise stated when her parents argued, they would tell her to leave the room. Although Mother and Father's frequent verbal arguments caused the children emotional and mental distress, there is no evidence that domestic violence between Mother and Father endangered the children's physical health and safety. "Neither section 300, subdivision (a) nor (b) provides for jurisdiction based on 'emotional harm.'" (*In re Daisy H., supra*, 192 Cal.App.4th at p. 718.)

In addition, Mother and Father were separated with no intent to reconcile, so the risk of any continuing domestic violence was diminished. The Department argues Mother and Father's separation did not eliminate the risk of physical harm to the children, relying on *In re R.C.* (2012) 210 Cal.App.4th 930, 943-944. *R.C.* is distinguishable. There, the parents had separated, but the violence continued, including an incident in which the father became upset, grabbed the mother, and pushed her against his car. (*Id.* at pp. 937, 942.) Three months later, the father rushed into the mother's apartment and slapped her face, pulled her hair, choked her, pushed her against the wall three

times, and threatened to kill her in the presence of their three-year-old child. (*Ibid.*) The Court of Appeal affirmed the jurisdiction finding under section 300, subdivision (b)(1), concluding the parents' separation did not diminish the risk of harm to the children from the father's domestic violence. (*R.C.*, at p. 944.) Here, Mother intended to end her relationship with Father before Emily disclosed the sexual abuse, and Mother and the children moved out of the home after Mother learned of the sexual abuse. Mother and the children planned to stay with the maternal grandfather until Mother was able to find another home. And Mother did not intend to reconcile with Father. Further, unlike *R.C.*, the children did not witness any domestic violence between Mother and Father, and there is no evidence of continuing domestic violence (or any contact) after Mother and Father separated. Under these circumstances, there is insufficient evidence to support the jurisdiction finding based on domestic violence.

E.     *On Remand the Juvenile Court Should Reconsider Its Disposition Orders as to Mother*

At the disposition hearing, the juvenile court ordered Mother to attend sexual abuse awareness counseling and individual counseling to address case issues including domestic violence. Although Mother is now a nonoffending parent, "there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311; accord, *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency

22

jurisdiction has been established"].)  However, we remand for the juvenile court to consider the disposition orders as to Mother in light of our reversal of the findings she failed to protect Isabelle and Nora from Father's sexual abuse and of Mother's domestic violence committed against Father.

## DISPOSITION

With respect to Isabelle and Nora, the jurisdiction findings under section 300, subdivisions (d) and (j), are affirmed, but the jurisdiction findings under section 300, subdivision (b)(1), as to sexual abuse and domestic violence are reversed.  We remand for the juvenile court to conduct a new disposition hearing to determine whether Mother should participate in sexual abuse awareness and domestic violence counseling.  We dismiss Mother's appeal as to Emily as moot.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

23